FILED

06/02/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0233

DA 25-0233

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 116

MONTANA ACADEMY OF SALONS,

       Petitioner and Appellant,

  v.

MONTANA BOARD OF BARBERS AND
COSMETOLOGISTS, and MONTANA
DEPARTMENT OF LABOR AND INDUSTRY,

       Respondents and Appellees.

APPEAL FROM:   District Court of the First Judicial District,
                  In and For the County of Lewis and Clark, Cause No. CDV-2023-460
                  Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Elizabeth A. O'Halloran, Kaleva Law Offices, Missoula, Montana

       For Appellees:

       Kevin G. Maki, Jeff Sealey, Agency Counsel, Montana Department
       of Labor & Industry, Helena, Montana

                        Submitted on Briefs:  November 19, 2025

                               Decided:  June 2, 2026

Filed:

                        _____
                                    Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Petitioner and Appellant Montana Academy of Salons (MAS) appeals from the January 30, 2025 Order on Petition for Judicial Review issued by the First Judicial District Court, Lewis and Clark County. The District Court denied the petition for judicial review filed by MAS, arising from the Final Order issued by the Montana Board of Barbers and Cosmetologists (Board). The Board's Final Order rejected the Proposed Findings of Fact; Conclusions of Law; and Recommended Order (Recommended Order) of the Office of Administrative Hearings (OAH) Hearing Officer—who presided over a multi-day hearing regarding the Board's proposed action against MAS's license, which recommended dismissal of the case—and ultimately issued various sanctions against MAS and placed MAS's school license on probation for a period of five years.

¶2 We address the following dispositive issue on appeal:

*Did the District Court err when it denied MAS's petition for judicial review?*

¶3 We reverse, with instructions to the District Court to grant the petition for judicial review and issue an order remanding to the Board with instructions to adopt the Hearing Officer's Recommended Order. As this issue is dispositive, we decline to address MAS's constitutional challenge to § 37-1-316(18), MCA (2013),[1] as either unconstitutionally vague or as an unconstitutional delegation of legislative authority.

---

[1] The conduct at issue in this case occurred between 2014 and 2016. Accordingly, the statute at issue is the 2013 version. Section 37-1-316, MCA, has since been amended, and subsection (18) is now located at § 37-1-316(1)(t), MCA (2025), but its language is otherwise unchanged. Unless otherwise noted, any references to § 37-1-316, MCA, in this Opinion are to the 2013 statute.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4　MAS operates a cosmetology school located in Great Falls, owned in part and operated by Michael and Linda McPherson. MAS offers courses in barbering, cosmetology, esthetics, manicuring, massage therapy, microdermabrasion, and teacher training. Since 2006, MAS has held school license No. 3199, issued by the Board. While MAS offers massage therapy instruction, it is not required to be licensed as a school by the Board in relation to massage therapy instruction, as massage therapists are governed by a separate professional board—the Montana Board of Massage Therapy. Since beginning its operation as a school in 2006, MAS has maintained a written sexual harassment or sexual violence policy.

¶5　Gene Watson began working at MAS as a massage therapy instructor in 2012. Between 2014 and 2016, MAS received student reports alleging inappropriate jokes and physical contact by Watson occurring both on and off campus. Linda, CEO of MAS and its Title IX Coordinator, investigated the students' complaints in 2014. Her assistant, Kathy Rhoden, along with MAS instructor Chris Cooper, investigated the 2015 complaints. MAS produced a Title IX Investigative Report on September 20, 2015, which found that, "[w]hile no student alleged Sexual Harassment; clearly [Watson's conduct discovered in the investigation] could fall under the definition of Sexual Harassment." On September 23, 2015, MAS issued a memo to Watson regarding his "unacceptable conduct," which served as a "final written warning." MAS informed Watson it determined he had "created an environment of hostility and intimidation," violated students' confidentiality and

3

privacy, and had engaged in physical contact with students which was not appropriate, and that he would be terminated if MAS learned of "any incident or conduct in the future[.]" This "last chance letter" was signed by Linda, Michael, and Watson. In March 2016, Rhoden discovered Watson massaging a female student, who was not a student in the massage program, behind a curtain in the esthetics room at MAS. Rhoden wrote a note to Linda about the incident because it made her uncomfortable, but Watson was not disciplined. More allegations related to Watson's conduct arose in June of 2016. MAS investigated these allegations and suspended Watson at this time. Ultimately, MAS terminated Watson's employment on July 6, 2016, because he breached the September 2015 agreement and "deliberately disregarded our direction, continued to engage in unprofessional conduct, violated ethical standards, and placed Montana Academy at financial risk."

¶6 On June 11, 2020, the Department of Labor and Industry's (DLI) Office of Legal Services issued a Notice of Proposed Board Action and Opportunity for Hearing, asserting several violations by MAS. On February 10, 2021, DLI issued an Amended Notice, narrowing its claim to the assertion that MAS committed unprofessional conduct by failing to meet the generally accepted standards of practice when responding to the students' allegations of sexual harassment and sexual violence against Watson. The matter proceeded to a contested case hearing before an OAH Hearing Officer. The four-day hearing occurred from July 26-28 and on October 12, 2021. The parties jointly filed Stipulated Facts and Exhibits prior to the hearing. In addition to the stipulated exhibits,

4

both DLI and MAS had exhibits admitted over objection during the course of the hearing. Rhoden, Linda, Michael, Cooper, DLI's expert witness Emily Stark, MAS's expert witness Daniel Farr, and Beth Murphy testified at the hearing. The Hearing Officer issued his Recommended Order on October 24, 2022. The Hearing Officer found that while MAS could have and should have done better with its investigations into Watson and adherence to its own policies, professional license discipline against MAS "based on a loosely-worded statute which can only be defined by expert testimony and which must be read into after-the-fact to determine what violation occurred is simply untenable." The Hearing Officer determined DLI failed to carry its burden of showing MAS committed unprofessional conduct and recommended the Board enter an order dismissing the case.

¶7 On February 10, 2023, the Board issued a scheduling order, allowing DLI and MAS to file exceptions to the Recommended Order. DLI filed exceptions, asserting the Board should modify certain findings of fact and conclusions of law and reject the Recommended Order. MAS filed a response asserting the Board should overrule DLI's exceptions and adopted the Recommended Order and DLI filed a reply. The Board's adjudication panel held a hearing on the matter on April 26, 2023. The Board issued its Final Order on May 31, 2023. The Board's Final Order amended the Recommended Order's Findings of Fact Nos. 35, 36, and 38, modified Conclusion of Law No. 3, and inserted additional Conclusions of Law Nos. 4-9. The Final Order rejected the recommended order of dismissal, determined MAS committed unprofessional conduct under § 37-1-316(18),

MCA, and issued numerous sanctions against MAS, including a fine and five-year probation of its school license.

¶8    MAS filed a petition for judicial review in the District Court on June 30, 2023, seeking a reversal of the Board's Final Order and a declaration that § 37-1-316(18), MCA, is unconstitutional as applied to MAS.  After the parties fully briefed the matter, the District Court issued its Order on Petition for Judicial Review on January 30, 2025.  The District Court determined the Board correctly modified Findings of Fact Nos. 35, 36, and 38, and that the Board's rejection of the Recommended Order was not arbitrary or capricious.  The court further ruled against MAS's constitutional claims related to § 37-1-316(18), MCA. The District Court ultimately found "no basis to reverse or modify" the Board's Final Order and affirmed it in its entirety.

¶9    MAS appeals.  Additional facts will be discussed as necessary below.

**STANDARD OF REVIEW**

¶10   The Montana Administrative Procedure Act (MAPA) governs actions brought before the Department of Labor and Industry.  A district court's review of an agency decision "must be conducted by the court without a jury and must be confined to the record[.]"  Section 2-4-704(1), MCA.  While the district court "may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," the district court may "reverse or modify the [agency's] decision if the substantial rights of the appellant have been prejudiced[.]"  Section 2-4-704(2), MCA.  Such prejudice occurs by way of administrative findings, inferences, conclusions, or decisions which are:

(i) in violation of constitutional or statutory provisions;

6

(ii) in excess of the statutory authority of the agency;

(iii) made upon unlawful procedure;

(iv) affected by other error of law;

(v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;

(vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion[.]

Section 2-4-704(2)(a), MCA. This standard of review applies to "both the District Court's review of the agency's decision and this Court's subsequent review of the District Court's decision." *Blaine Cnty. v. Stricker*, 2017 MT 80, ¶ 16, 387 Mont. 202, 394 P.3d 159. We review a district court's conclusions of law "de novo to determine whether its interpretation of the law is correct." *Stricker*, ¶ 17. "An evaluation of a petition for judicial review calls for the Court to review the entire administrative record." *DeBuff v. Mont. Dep't of Nat. Res. & Conservation*, 2021 MT 68, ¶ 24, 403 Mont. 403, 482 P.3d 1183 (citing *KB Enters., LLC v. Mont. Human Rights Comm'n*, 2019 MT 131, ¶ 6, 396 Mont. 134, 443 P.3d 498).

**DISCUSSION**

¶11 *Did the District Court err when it denied MAS's petition for judicial review?*

¶12 MAS asserts the Board violated its substantial rights when it rejected the Hearing Officer's Recommended Order, which recommended dismissal of the case because DLI failed to carry its burden of showing MAS committed unprofessional conduct, and instead adopted a final order which arbitrarily disciplined MAS for violating a novel "generally accepted standard of practice" relating to investigating sexual harassment claims and

7

writing investigative reports. The Board contends the District Court correctly affirmed its Final Order because MAS failing to follow its own policies and procedures when responding to reports of sexual misconduct constituted unprofessional conduct.

¶13 At the outset, it is important to set forth what needs to be decided here. The administrative record in this case consists of approximately two thousand pages and includes a transcript of the four-day hearing before the Hearing Officer. Much of this record revolves around the salacious allegations made against Watson.[2] As noted by the Hearing Officer, "MAS could have and should have done better with its investigation, report writing, and adherence to policies" when responding to the allegations reported by students related to Watson's conduct. Essentially, there is no dispute that MAS fell short when it investigated and responded to those allegations. But in a license discipline proceeding such as this, the question to be answered before the Board is not whether MAS could have improved its practice, but whether its conduct constituted "unprofessional conduct" as defined by statute.

¶14 By statute, the Board, like all other occupational and professional boards under DLI jurisdiction, is required to:

> (i) set and enforce standards and adopt and enforce rules governing the licensing, certification, registration, and conduct of the members of the particular profession or occupation within the board's jurisdiction; and
>
> (ii) apply the standards and rules referred to in subsection (1)(a)(i) in a manner that does not discriminate against any person licensed by the board

---

[2] Watson was fired by MAS in 2016. His massage therapy license was revoked by the Montana Board of Massage Therapy in 2018 and he was criminally convicted of committing sexual assaults during massages in 2020.

with regard to how the standards and rules are applied to other persons licensed by the board and that does not restrain trade or competition unless necessary to protect public health and safety[.]

Section 37-1-131(1)(a), MCA. The text of the relevant statute applied by the Board in this license discipline case states that "unprofessional conduct for a licensee or license applicant" is "conduct that does not meet the generally accepted standards of practice. A certified copy of a malpractice judgment against the licensee or license applicant or of a tort judgment in an action involving an act or omission occurring during the scope and course of the practice is conclusive evidence of but is not needed to prove conduct that does not meet generally accepted standards[.]" Section 37-1-316(18), MCA.

¶15 Both parties stipulated to the fact that the Board had never previously disciplined a salon school for failing to meet the generally accepted standards of practice for responding to claims of sexual harassment or sexual violence. As such, this license discipline action was a matter of first impression for what "generally accepted standards of practice" means when applied to a salon school investigating sexual harassment claims. The parties each presented the testimony of expert witnesses on this point. The Hearing Officer determined DLI was "pursuing a violation of something it cannot itself articulate without several days of hearing and voluminous briefing" and recommended dismissal of the case. The Board rejected the finding, concluding, as a matter of law, that MAS "adopted adequate policies and procedures" related to sexual harassment, but the "issue before the Board is MAS's failure to follow and comply with those policies and procedures."

¶16 At all times relevant to this case, and up to the present day, MAS has had in place sexual harassment policies and procedures which comply with both federal Title IX and state requirements. The sole basis for license discipline in this case was the Board's legal conclusion that failing to follow its own policies constituted "unprofessional conduct" on the part of MAS. The burden to demonstrate MAS committed unprofessional conduct lies with DLI. *See, e.g., Ulrich v. State ex rel. Bd. of Funeral Serv.*, 1998 MT 196, ¶ 8, 289 Mont. 407, 961 P.2d 126. By statute, unprofessional conduct is "conduct that does not meet the generally accepted standards of practice." Section 37-1-316(18), MCA. The initial vague language used in that statutory subsection is immediately qualified with language noting that both malpractice and tort judgments are "conclusive evidence of but [are] not needed to prove conduct that does not meet generally accepted standards[.]" Section 37-1-316(18), MCA.

¶17 The primary thrust of MAS's argument is that the area of law regarding a school unsatisfactorily investigating student reports of sexual harassment and/or violence is traditionally (and properly) addressed through either Title IX or the Montana Human Rights Act (MHRA), and the Board is attempting to use the vague language of § 37-1-316(18), MCA, to arbitrarily discipline MAS for conduct which a salon school was not on notice could be subject to license discipline by the Board. That statutory language refers to conduct which does not meet the "generally accepted standards of practice." But what constitutes the "generally accepted" standard of practice for a salon school responding to student sexual harassment complaints? The term is not defined by statute. The hearing

officer correctly analogized the "generally accepted" standard of practice to the "standard of care" used in this Court's decisions regarding professional negligence. "Under Montana law, expert testimony is required to establish the standard of care unless the conduct complained of is readily ascertainable by a layman." *Brookins v. Mote*, 2012 MT 283, ¶ 63, 367 Mont. 193, 292 P.3d 347 (internal quotation marks and citation omitted). "The rationale for requiring expert testimony to establish a standard of care for professionals acting in their professional capacity is that such professionals are required to possess a minimum standard of special knowledge and ability, and as a result juries which are composed of laypersons are normally incompetent to pass judgment on such questions without the assistance of expert testimony." *Newville v. Dep't of Family Servs.*, 267 Mont. 237, 257, 883 P.2d 793, 805 (1994) (citation omitted).

¶18 As we've previously noted, the administrative record in this case totals approximately 2000 pages and the Hearing Officer conducted a four-day hearing on the matter. Sifting through all of this, the Hearing Officer noted his difficulty in determining what exactly DLI was asserting because the arguments of the parties went in "all directions and cover[ed] many topics without reaching any definitive conclusion[.]" At the hearing, DLI presented the expert testimony of Emily Stark, while MAS countered with the expert testimony of Daniel Farr. Stark testified to a laundry list of things a school should do when responding to a report of sexual harassment, many of which were based in Title IX guidance. Examples included, among others, the need to conduct a thorough and impartial investigation, which uses the preponderance of the evidence standard and culminates in a

11

written report and, germane to the issue before us here, the need for an educational institution to follow its own policies and procedures. Farr largely concurred with Stark, though he noted there is not specific guidance on how to write a report and that the Department of Education's Office of Civil Rights (OCR), which enforces educational institutions' compliance with Title IX, does not specifically require all items he (or Stark) believe should be in a report. The Hearing Officer who presided over the hearing determined Stark testified "to what were, in fact, best practices and not generally accepted standards of practice."

¶19 MAS did not conduct what could be considered a "thorough" investigation of the students' complaints in this matter. The written reports created by MAS focused primarily on whether the conduct was required to be reported pursuant to Title IX, not on a thorough investigation into whether the conduct complained of actually occurred. But it has not faced discipline by OCR under Title IX. Had MAS failed in its investigation in such a way as to be penalized by OCR that could, potentially, be analogized to a malpractice or tort judgment as evidence of unprofessional conduct under § 37-1-316(18), MCA, but we need not reach such a determination here because no such finding exists. Under Title IX, for a school to face discipline and be subject to a private damages action, the school must be "deliberately indifferent to known acts of teacher-student discrimination." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643, 119 S. Ct. 1661, 1671 (1999). "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subjects' its students to harassment." *Davis*, 526 U.S. at 644-45,

12

119 S. Ct. at 1672. The deliberate indifference standard under Title IX is a high bar, and a school failing to follow either Department of Education guidance or its own policies does not ordinarily establish deliberate indifference. *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1107 (9th Cir. 2020) (collecting cases).

¶20 Even though a school not following Department of Education guidance and/or its own policies would not, without more, open up that school to private damages under Title IX, the Board has put forth the argument that a school not following its own policies is unprofessional conduct. The statute does not support that interpretation. DLI asserted a school failing to follow its own policies violates the generally accepted standards of practice for a salon school, and therefore MAS is subject to license discipline.[3] The Hearing Officer correctly rejected this contention as the Board improperly grafting additional requirements onto a statute, which it does not have authority to do. *See Bd. of Barbers of Dep't of Prof'l & Occupational Licensing v. Big Sky Coll. of Barberstyling*, 192 Mont. 159, 162, 626 P.2d 1269, 1271 (1981). The Board rejected the Hearing Officer's correct conclusion of law—that DLI failed to demonstrate MAS committed unprofessional conduct by not adhering to the generally accepted standards of practice—and replaced it with incorrect conclusions of law. The District Court affirming this incorrect interpretation was in error.

---

[3] As pointed out by MAS, this interpretation could create a perverse incentive structure for schools under the Board's jurisdiction to have minimal policies and procedures if any deviation from those policies and procedures could be termed "unprofessional conduct" and subject a school to license discipline.

¶21 MAS has been prejudiced by the Board's arbitrary application of an unwritten standard requiring strict adherence to internal policies when investigating reports of sexual harassment and/or violence or be subject to license discipline. Title IX caselaw reflects that a failure to follow policies is generally insufficient to allow private damages—essentially equivalent to a malpractice or tort action as contemplated by § 37-1-316(18), MCA—against a school. *See Karasek*, 956 F.3d at 1107 (collecting cases). The expert testimony at the four-day administrative hearing failed to demonstrate that strict adherence to a school's own policies is a "generally accepted standard of practice," though it is certainly a "best practice" to which a school should aspire. Ultimately, the Board simply did not articulate to the salon schools under its purview that a sloppy investigation which does not comply with a school's own policies would be considered unprofessional conduct subject to license discipline. Its attempt to discipline MAS based on a failure to live up to this unwritten standard by rejecting the Hearing Officer's correct findings of fact and conclusions of law was arbitrary and prejudiced MAS. After 2000 pages of administrative record and a four-day hearing, the Hearing Officer correctly cut through all of the noise to reach the conclusion that attempting to apply the standards the expert witnesses believed to be applicable to "nebulous and unclear" rules "seriously risks arbitrary imposition of discipline without prior notice of standards." As aptly summed up by the Hearing Officer, "a professional licensing action based on a loosely-worded statute which can only be defined by expert testimony and which must be read into after-the-fact to determine what violation occurred is simply untenable." We reverse the District Court's affirmation of the

14

Board's Final Order because MAS suffered prejudice from the arbitrary actions of the Board and the Final Order's modified conclusions of law are incorrect.

## CONCLUSION

¶22 The District Court erred when it denied MAS's petition for judicial review and affirmed the Board's Final Order. The Board's rejection of the Hearing Officer's thorough and well-reasoned discussion regarding DLI's failure to meet its burden to demonstrate unprofessional conduct by way of generally accepted standards of practice was arbitrary and its legal conclusions flowing from that rejection were incorrect.

¶23 Reversed and remanded.

/S/ INGRID GUSTAFSON


We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ LAURIE McKINNON

15